UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAM MICHAEL CARRAWAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:03CV1077 FRB |
| ) | |
| CHRISTIAN HOSPITAL ) | |
| NORTHEAST/NORTHWEST, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

Presently pending before the Court is plaintiff William Michael Carraway's Motion for New Trial (Docket No. 128). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

Plaintiff William Michael Carraway brought this action against defendants Christian Hospital Northeast/Northwest, Dr. Andrew Dickler and Dr. Naveed Razzaque, alleging that the negligent actions of the defendants resulted in the wrongful death of his father, decedent Donald E. Carraway. In addition, in his capacity as administrator of decedent Donald E. Carraway's estate, plaintiff William Michael Carraway brought a claim against the defendants alleging that their negligence resulted in decedent's loss of chance of survival. Plaintiff sought compensatory and punitive damages. The matter was tried to a jury which, on September 30, 2005, returned a verdict in favor of defendants on plaintiff's claim of wrongful death. Plaintiff's claim of loss of chance of

survival was not submitted to the jury.  Judgment reflecting the jury's verdict was entered that same date.

Plaintiff now moves for a new trial arguing that the Court erred in denying plaintiff's request for mistrial inasmuch as the members of the jury which deliberated and returned the verdict in this cause were tainted by the misconduct of other jurors who had been dismissed from the panel; that the Court erred in allowing the jurors, albeit unintentionally, to handle and experiment with an admitted exhibit, namely, an exemplar of the guide wire at issue in the cause; that the Court erred by excluding evidence of certain statements made by Nurse Keith Hoekler; that the defendants improperly questioned and elicited testimony from their expert witness as to the decedent's cause of death, in violation of the Court's previous order that such testimony would be excluded; that the cumulative effect of the errors during the course of the trial warranted a mistrial in the cause; and that the jury's verdict was against the weight of the evidence.  Defendants have responded to the motion.

> Federal Rules of Civil Procedure 59 confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict. . . . A new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice.

Gray v. Bicknell, 86 F.3d 1472, 1480 (8th Cir. 1996) (citations omitted).

The determination to grant a new trial rests within the discretion of the trial court. Id. (citing Citizens Bank ov Batesville, Ark. v. Ford Motor Co., 16 F.3d 965, 967 (8th Cir. 1994)). When addressing a motion for new trial, the Court can "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992). Although the Court has discretion to set aside the jury verdict and grant a new trial, it "may not do so merely because it believes that the evidence permitted different inferences or that another result would be more reasonable." Blake v. J.C. Penney Co., 894 F.2d 274, 281 (8th Cir. 1990). Instead, "the [C]ourt must conclude that the jury reached a seriously erroneous result and must state its reasons for this belief." Id. The Court's ultimate inquiry is whether the first trial resulted in a miscarriage of justice. White, 961 F.2d at 780. The burden of demonstrating that error warrants a new trial rests with the moving party. Comerio v. Beatrice Foods Co., 616 F. Supp. 1423, 1428 (E.D. Mo. 1985); see also Ricketts v. City of Columbia, Mo., 856 F. Supp. 1337, 1347 (W.D. Mo. 1993) (citing Comerio, 616 F. Supp. at 1428), aff'd, 36 F.3d 775 (8th Cir. 1994); Ramstad v. Lear Siegler Diversified Holdings Corp., 836 F. Supp. 1511, 1514 (D. Minn. 1993).

A.  <u>Jury Bias and Misconduct</u>

Trial commenced in this cause on September 26, 2005, with voir dire examination which resulted in the selection and seating of eight jurors. On September 28, 2005, at the conclusion of the third day of trial, the court clerk advised the Court that one juror, Ms. Harrison, had expressed to him that another juror, Mr. Burch, was acting in a way which demonstrated a bias against the plaintiff including making a remark indicating that he was not interested in a fair hearing for the plaintiff. The following morning and prior to resuming trial, the clerk delivered to the Court a memorandum which Juror Harrison prepared the previous evening and which detailed her concerns as expressed the previous day, and specifically, that Juror Burch criticized her for waking a sleeping juror and stated that they did not have a duty to pay attention and particularly to plaintiff whom Juror Burch felt was staring him down; that Juror Burch chastised her and made threatening remarks that she should not extend the deliberations in this matter by asking questions; and that Juror Burch's statements and other conduct caused her and others on the jury to feel intimidated. Upon consultation with counsel, the undersigned determined to conduct an *in camera* hearing to inquire of all the jurors, individually, as to such matters. <u>See</u> <u>United States v. Hall</u>, 85 F.3d 367, 369 (8th Cir. 1996) (court to conduct hearing when allegation of jury taint arises).

The Court began the hearing with Juror Harrison, who confirmed that she had expressed her concerns to the court clerk the previous day and had written the detailed memorandum. Juror Harrison also expounded that she felt the entire jury panel was intimidated by Juror Burch inasmuch as the other jurors tend to sit quietly in the jury room and look down or away when Juror Burch makes his remarks. The Court then continued in the hearing with each juror questioned individually as to whether they had heard any juror make comments regarding the parties and/or witnesses in the case, whether they themselves made any such comments, and whether they engaged in or observed any conduct which could be considered threatening or intimidating. Each of the subsequent six jurors questioned responded in the negative to each question put by the Court. The final juror to be questioned, Juror Burch, likewise answered in the negative to each question, but upon a more direct inquiry as to whether he commented on plaintiff staring at him, Juror Burch responded that he had remarked about the seating arrangement of the parties in the courtroom and that he felt uncomfortable in that, with such arrangement, plaintiff was in a position where he was staring at the jury.

At the conclusion of the hearing, plaintiff moved for a mistrial arguing that the jury was tainted by Juror Burch's remarks regarding plaintiff, which he admitted to making, and that concerns existed regarding the integrity of the jury inasmuch as, despite

these admitted remarks, no juror informed the Court of them during the hearing. In the alternative, plaintiff requested that both Juror Harrison and Juror Burch be removed from the jury. Defendants requested that only Juror Harrison be removed from the jury inasmuch as her complaints were not corroborated and she was the only juror who indicated that she could not serve on the jury in the presence of Juror Burch. Upon thoughtful consideration of the parties' respective arguments, the Court determined to remove both Juror Harrison and Juror Burch from the jury. Trial resumed and a jury of the six remaining jurors continued on the case through its conclusion.

In his Motion for New Trial, plaintiff continues in his argument that the remaining jurors in the case were tainted by Juror Burch's remarks and that plaintiff suffered prejudice by the failure of the Court to declare a mistrial inasmuch as the remaining jurors' denial that they had heard any such remarks "signal[ed] that the jurors were not candid with themselves or the Court." (Pltf.'s Memo. at p. 5.) For the reasons stated on the record upon the conclusion of the *in camera* hearing, plaintiff's claim should be denied.

The district court has broad discretion in managing juror misconduct allegations. <u>United States v. Wintermute</u>, 443 F.3d 993, 1002 (8th Cir. 2006). In this cause, the undersigned conducted an *in camera* hearing on the allegations made by Juror Harrison and,

upon consideration of the information obtained thereby, the demeanor of the jurors in responding to the questions put by the Court, the demeanor of and forthrightness displayed by the jurors during voir dire examination, and the personal history of each of the jurors as provided to the Court and the parties during voir dire examination, the undersigned determined that the information before the Court failed to corroborate the allegations of misconduct; that there was insufficient information to support a finding that any juror was influenced, intimidated or in any other way not candid with the Court; and that it was apparent that to the extent Juror Burch may have made any comment regarding plaintiff, such comment had no impact upon the other jurors, let alone a prejudicial impact, inasmuch no juror could recall any statement made regarding any party in the cause.  Finally, the undersigned observed that with the information obtained from the jurors during the hearing, it was apparent that the jurors were attempting to adhere to the Court's admonishment that they were not to discuss the case until the conclusion of trial and upon submission of the case for deliberation.

Upon review of the record and the specific findings made thereon regarding the integrity of the jury, the undersigned determines the Court's previous rulings to deny plaintiff's request for mistrial and to grant plaintiff's alternative request to excuse both Jurors Harrison and Burch not to be in error, and plaintiff's

claim otherwise should be denied.

B.  Juror Experimentation

During the course of jury deliberations, the jury submitted a note to the Court requesting that they be permitted to have the guide wire and a metric ruler. The Court conferred with counsel regarding the request and it was agreed that a ruler would not be provided to the jury inasmuch as one was not in evidence in the case. Plaintiff's counsel further objected to providing the jury with the guide wire arguing that the provision of such would improperly permit the jury to conduct its own testing or experimentation with the device. Defendants agreed with plaintiff's position. Reluctant to instruct the jury that it could not examine an item which had been admitted in evidence, the Court suggested to counsel that the guide wire be placed on a table in the courtroom and that the jurors be allowed to come into the courtroom to view the guide wire. Plaintiff generally agreed to the procedure, but objected to the jurors' handling and conducting any tests with the guide wire. Defendants agreed that the jurors should not be allowed to conduct any measurements, but expressed no objection to the jurors otherwise being able to pick up the guide wire and feel it.

Thereafter, the guide wire was placed on a table in the courtroom and the jury was admitted to the courtroom for the purpose of looking at and examining the guide wire. After being

instructed that they could approach the table and examine and pick up the guide wire, various jurors did so. The Court observed one juror, upon picking up the guide wire, to place the guide wire against his shoulder and to turn to face other jurors, whereupon the Court immediately instructed the jurors not to perform any investigation or to conduct any experiments with the evidence. The juror promptly returned the guide wire to the table. The jury thereafter returned to the jury room to continue in its deliberations. Plaintiff sought no relief from the Court prior to the jury's verdict regarding the juror's conduct with the guide wire.

Plaintiff contends in the instant motion that the juror's conduct constituted improper experimentation which severely prejudiced plaintiff inasmuch as an issue contested throughout trial was whether the guide wire placed in the decedent during the replacement of the catheter line was long enough to travel from its point of entry to the decedent's vena cava where the Greenfield filter was located. Plaintiff's argument is misplaced. During the course of the trial of this cause, conflicting testimony and evidence was adduced relating to the issue of whether the guide wire could reach and snag the decedent's Greenfield filter. During his direct testimony, Dr. Dickler used a piece of string of the same length as the guide wire and positioned the string on his body to demonstrate that the length of the guide wire would be

insufficient to reach the Greenfield filter. Plaintiff did not object to this demonstration. In similar fashion, Dr. Salzman physically placed the guide wire itself on his body to demonstrate that the guide wire could not reach the Greenfield filter. Plaintiff did not object to this demonstration.

Here, the juror placed the guide wire against his shoulder and turned to face the other jurors. Inasmuch as the guide wire was admitted as evidence at trial, testimony and evidence had been adduced regarding the significance of the length of the wire, and similar demonstrations had been performed by witnesses without objection during the trial, the juror's challenged conduct here was neither improper nor prejudicial. See generally Banghart v. Origoverken, A.B., 49 F.3d 1302 (8th Cir. 1995). In placing the guide wire against his body, the juror merely evaluated the evidence introduced at trial by subjecting certain evidence to further scrutiny. Id. at 1307. In the circumstances of this case, the juror's conduct does not warrant a new trial. Id.

C. Exclusion of Nurse Hoekler's Statements

Prior to trial, defendants Christian Hospital Northeast/Northwest and Dr. Dickler filed a Motion in Limine seeking to exclude, *inter alia*, hearsay statements of Marie Carraway and other witnesses to the extent such witnesses would testify to statements made by Nurse Keith Hoeckler the morning following the replacement

of the decedent's central catheter line that "Dr. Razzaque tried several times to put it [(the central line)] in and couldn't get it in," and that "one of the doctors tried for hours and couldn't get it in." (M. Carraway Depo. at 46; K. Hodgkiss Depo. at 24-25.) In response, plaintiff argued (and continues to argue in the instant motion), that such statements are not hearsay but rather are admissions of a party opponent inasmuch as they were made by the opponent's employee in the course of his employment duties and were related to his work. The Court conducted a hearing on the motion prior to trial and determined, under the Eighth Circuit's holding in <u>Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n</u>, 551 F.2d 1136 (8th Cir. 1977), that such statements were not admissions of a party opponent and constituted inadmissible hearsay within hearsay inasmuch as it was undisputed that Nurse Hoeckler was not working and thus not present during the replacement of the central line and therefore did not observe Dr. Razzaque's conduct which he described to the witnesses, and that the author of the information which was relayed by Nurse Hoeckler to the witnesses was unknown.

Upon review of plaintiff's renewed argument raised in the instant motion, nothing submitted by the plaintiff in his motion or supporting memorandum serves to persuade the Court that the ruling made on this matter at the time of trial was incorrect. Upon review of the claim raised and the record in this cause, the undersigned determines the Court's previous ruling not to be in

error for the reasons previously stated on the record. See Cedeck, 551 F.2d at 1138.

D.   Questioning by and Statements of Defense Counsel

Defendants retained Dr. Michael Graham as an expert witness to examine the decedent's autopsy report and pathology specimens and to prepare a report and testify as to his opinion regarding such. In his report, Dr. Graham did not render an opinion as to the cause of decedent's death. Prior to defendants' presentation of Dr. Graham's testimony at trial, plaintiff moved that Dr. Graham not be permitted to testify as to his opinion regarding the cause of decedent's death inasmuch as such opinion was absent from his report. In response, defense counsel stated that he would not ask Dr. Graham about his opinion as to the cause of death, but rather that he would inquire as to what did *not* cause the decedent's death. With continued objection by plaintiff and upon the Court's request for clarification, defense counsel represented that he would inquire of Dr. Graham as to his opinion, which was contained in his report, as to whether the one-to-two millimeter perforation of the vena cava which occurred prior to death was large enough to cause massive hemorrhage in the retro-peritoneum. The Court permitted counsel to question Dr. Graham to this effect.

During direct examination, Dr. Graham testified that with his examination, he observed two perforations to the decedent's

vena cava – one which had occurred subsequent to the decedent's death, and one which had occurred while decedent was alive and which measured one-to-two millimeters in length. Dr. Graham also testified as to the size of hemorrhage he observed to the decedent's retro-peritoneum and further testified that he did not observe a larger hemorrhage which was described by Dr. Richard Payne in his autopsy report. Defense counsel then asked Dr. Graham if a one-to-two millimeter perforation would result in a massive hemorrhage causing or contributing to cause a person's death. Plaintiff's objection to this question was overruled. In response, Dr. Graham testified only that such a small hole would not result in massive hemorrhage. Dr. Graham did not testify as to whether such would cause or contribute to cause death. During subsequent questioning, defense counsel asked Dr. Graham whether the one-to-two millimeter defect in the decedent's vena cava caused the decedent's death. Prior to any response, the Court halted the proceedings, ordered counsel to sidebar and reminded defense counsel of his previous representation to the Court that he would not engage in such line of questioning. Counsel resumed questioning of Dr. Graham omitting any further reference to the cause of decedent's death.

During closing argument, defense counsel argued that the evidence showed the one-to-two millimeter defect in the vena cava could not have caused a massive bleed. Counsel further argued that

Dr. Graham testified that the hemorrhage observed by Dr. Graham could not have caused the decedent's death. Subsequent to plaintiff's objection to this specific argument, defense counsel clarified that Dr. Graham testified that the one-to-two millimeter tear could not have caused the massive bleed which Dr. Payne reported caused the decedent's death. In his rebuttal argument, plaintiff argued to the jury that other evidence and other opinions showed such a perforation to be able to cause such a hemorrhage.

> "[I]mproper questioning by counsel generally entitles the aggrieved party to a new trial if it conveys improper information to the jury and prejudices the opposing litigant." <u>Silbergleit v. First Interstate Bank of Fargo</u>, 37 F.3d 394, 398 (8th Cir. 1994) (citing <u>Sanders-El v. Wencewicz</u>, 987 F.2d 483, 484 (8th Cir. 1993)). When counsel repeatedly attempts to use irrelevant and prejudicial evidence, the possibility of improper influence is increased. <u>Id.</u> Counsel's misconduct may be such that a district court cannot overcome its prejudicial effect by admonishing the jury or rebuking counsel; in such case a court should grant a new trial. <u>Id.</u> The District Court has broad discretion in deciding whether questioning by counsel is so prejudicial that a new trial is warranted, <u>id.</u>[.]

<u>Blair v. Wills</u>, 420 F.3d 823, 829-30 (8th Cir. 2005).

Upon review of the record in this case, the undersigned does not find the conduct of defense counsel, the testimony of Dr. Graham or the statements made during closing argument challenged by plaintiff to be so prejudicial that a new trial is warranted.

The evidentiary portion of this five-day trial spanned three full days and included the testimony of ten witnesses, including the testimony of multiple expert witnesses presented by all parties. To the extent defense counsel questioned Dr. Graham as to whether a one-to-two millimeter perforation in the vena cava would result in a massive hemorrhage causing or contributing to cause a person's death, the undersigned notes that Dr. Graham did not testify as to whether it would cause death, but only testified that a massive hemorrhage could not result. The undersigned further notes that to the extent defense counsel specifically asked Dr. Graham whether the perforation caused the decedent's death here, the Court, without awaiting objection by plaintiff, admonished counsel and reminded him that such questioning was not permitted. Dr. Graham did not respond to this inquiry and counsel did not pursue this line of questioning further. The undersigned does not find the isolated instance of two objectionable questions, to which objectionable responses were *not* elicited, to rise to such a level to warrant a new trial. Contra Blair, 420 F.3d at 830 (fifty-two objectionable questions posed by counsel during a two-and-a-half-day trial, including questions relating to irrelevant material). This is especially true where, as here, there was evidence admitted at trial to support plaintiff's theory that such a perforation caused the hemorrhage which in turn caused the decedent's death.

To the extent defense counsel may have improperly argued during closing argument that Dr. Graham testified that the tear did not cause the decedent's death, the undersigned notes that in response to plaintiff's objection, counsel subsequently clarified his argument by accurately summarizing Dr. Graham's testimony regarding the extent to which the perforation could have caused a massive bleed. The undersigned further notes that plaintiff argued during closing argument that contrary to Dr. Graham's opinion, other evidence presented during trial demonstrated that such a massive bleed could have been caused by the perforation. Indeed, as is evident from a review of the record in this cause, there was conflicting evidence which required credibility determinations by the jury, and each counsel vigorously argued the extent to which the jury should find each witness credible. In view of the limited nature of defense counsel's inaccurate characterization of Dr. Graham's testimony, his clarification of such testimony upon objection, counsel's arguments as to the credibility of each witness including plaintiff's argument summarizing evidence contradicting Dr. Graham's opinion, and the Court's instruction to the jury that closing arguments are not evidence, the undersigned does not find plaintiff to have been prejudiced by defense counsel's conduct during closing argument or otherwise.

Plaintiff's claim, therefore, that defense counsel's conduct in questioning Dr. Graham and in their presentation of

closing argument to the jury resulted in prejudice to the plaintiff such that a new trial is warranted, should be denied.

E.  Cumulative Effect of Errors

Inasmuch as plaintiff's individual claims of alleged error resulted in no prejudice to plaintiff, "aggregating them changes little." United States v. Londondio, 420 F.3d 777, 789 (8th Cir. 2005). Plaintiff has failed to show that the cumulative effect of the claimed errors resulted in prejudice such that a new trial is warranted.

F.  Weight of the Evidence

Plaintiff claims that the jury's verdict for the defendants in this cause was against the weight of the evidence, arguing specifically that there was no evidence presented that would support a finding that the decedent's death was caused by anything other than a retro-peritoneal bleed.

The burden of demonstrating that the verdict was against the weight of the evidence rests with the moving party. Ricketts v. City of Columbia, Mo., 856 F. Supp. 1337, 1347 (W.D. Mo. 1993) (citing Comerio v. Beatrice Foods Co., 616 F. Supp. 1423, 1428 (E.D. Mo. 1985)), aff'd, 36 F.3d 775 (8th Cir. 1994). The Court will grant a new trial only "if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." United States v. Walker, 393 F.3d 842, 848 (8th Cir. 2005). Upon review of the evidence and testimony adduced at the

trial of this cause, the undersigned cannot conclude that the jury's verdict was not supported by the evidence or resulted in a miscarriage of justice.  As discussed above, there was conflicting credible evidence adduced from numerous witnesses, including multiple expert witnesses, from which the jury was required to determine whether plaintiff had met his burden of proving by a preponderance of such evidence that the decedent's death was caused by the defendants' negligence.  The jury's verdict demonstrated that the plaintiff failed to meet his burden.  Upon review of the evidence, the undersigned cannot state that the jury's verdict was unreasonable.  "[W]here reasonable men can differ in evaluating credible evidence, a new trial on the ground of weight of the evidence should not be granted."  White, 961 F.2d at 781.

Therefore, to the extent plaintiff's Motion for New Trial is based on the claim that the jury's verdict was against the weight of the evidence, the motion should be denied.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff William Michael Carraway's Motion for New Trial (Docket No. 128) is denied.

*/s/ Frederick R. Buckles*
UNITED STATES MAGISTRATE JUDGE

Dated this  *30th*  day of August, 2006.